## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JACOB RYAN HELSEL,

    Plaintiff,

v.

CORPORAL CHRISTOPHER
OVES ET AL.,

    Defendants.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

*

*

*

*      Civil No. 23-00373-BAH

*

*

### MEMORANDUM OPINION

Plaintiff Jacob Ryan Helsel ("Plaintiff") sued various members of the Montgomery County Police Department alleging Defendants violated Plaintiff's federal and state constitutional rights by employing a vehicle containment technique that required the four officers to "strike" Plaintiff's vehicle with their vehicles. ECF 1, at 2; ECF 1, at 6–7 ¶¶ 26–29 (tense altered). The Defendants include Corporal Christopher Oves ("Oves"), Officer Michael Hartman ("Hartman"), Officer Brian Helton ("Helton") and Officer Jonathan Anspach ("Anspach" and collectively "Defendants"). *Id.* Pending before the Court is Defendants' motion for summary judgment (the "Motion."). ECF 37. Plaintiff filed an opposition, ECF 49, and Defendants filed a reply, ECF 54. All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendants' Motion is **GRANTED**.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

## I.    BACKGROUND

This suit concerns Defendants' method of arresting an individual named Michael John Griffith, Plaintiff's father, ECF 49-6 (Helsel Deposition), at 4, who at the time of the arrest was a passenger in Plaintiff's vehicle, ECF 37-9 (Hartman Affidavit), at 2–3 ¶¶ 9–11; ECF 49, at 1–2. Specifically, Plaintiff complains of Defendants' employment of a so-called vehicular containment technique ("VCT") that involves each of the four law enforcement officer Defendants "colliding into" Plaintiff's stopped car from the front, rear, and sides. ECF 1, at 6–7 ¶¶ 25–29. Defendants maintain they received specialized training to perform this technique "safely, effectively and to minimize the risk of injury" and that "[t]he safety of all vehicle occupants, including occupants of both the target vehicle and officer vehicles, is taken into consideration when a VCT is implemented." ECF 37-8, at 2 ¶ 5; ECF 37-9, at 2 ¶ 5; ECF 37-10, at 2 ¶ 5.

### A.    The Vehicular Containment Technique

Oves, Hartman, Helton, and Anspach are members of the Sixth District Special Assignment Team ("SAT"). *See* ECF 37-8, at 1 ¶ 3; ECF 37-9, at 1 ¶ 3; ECF 37-10, at 1 ¶ 3; ECF 37-14, at 2. Members of the SAT are responsible for "surveillance, service of warrants, and criminal and drug enforcement." ECF 37-8, at 1 ¶ 3; ECF 37-9, at 1 ¶ 3; ECF 37-10, at 1 ¶ 3. Additionally, SAT officers receive "specialized training in apprehending felony subjects and other individuals that pose a threat of violence" and "may be called upon to assist other units in locating and apprehending wanted subjects." ECF 37-8, at 1 ¶ 3; ECF 37-9, at 1 ¶ 3; ECF 37-10, at 1 ¶ 3. One type of specialized training SAT officers receive is in the "performance of a police technique known as a vehicular containment technique ("VCT")." ECF 37-8, at 1 ¶ 4; ECF 37-9, at 1 ¶ 4; ECF 37-10, at 1 ¶ 4.

Defendants testify that the VCT at issue is a "controlled maneuver during which unmarked police vehicles are positioned in close proximity around a target's vehicle located at a natural

2

stop." ECF 37-8, at 2 ¶ 6; ECF 37-9, at 2 ¶ 6; ECF 37-10, at 2 ¶ 6. Once the police vehicles are in place, an officer calls out via closed radio for the VCT to begin, and "the officers operate their vehicles at a low rate of speed to simultaneously make controlled contact with the subject vehicle to contain the vehicle on all sides to prevent the target's movement and avenues of escape." ECF 37-8 ¶ 6; ECF 37-9 ¶ 6; ECF 37-10 ¶ 6.

A VCT may be used "when the subject has a violent criminal history, violent active charges and/or a history of weapons possession, all of which implicate a serious risk to the lives and safety of the officers, the subject and the community during the arrest encounter." ECF 37-8, at 2 ¶ 7. The VCT is used in these scenarios because it "reduces the opportunity for the subject to flee by foot or by vehicle, which could result in a vehicle pursuit or other scenario that is dangerous to the target, officers and the community at large." *Id.* ¶ 8. The VCT also "creates the element of surprise, which reduces the opportunity for the subject (and the subject's associates) to arm themselves and discharge their weapons at the arresting officers and/or other members of the community who may be located in the vicinity." *Id.*

## B. The Determination to Employ a VCT

On February 12, 2020, Anspach received a request for SAT to assist Detective James Kafchinski of the Montgomery County Department of Police, Special Victims Investigation Division in locating and arresting Michael John Griffith. ECF 37-8, at 3 ¶ 10. Griffith was the subject of four felony arrest warrants for second-degree rape, sexual abuse of a minor, and other sex related offenses against minors. *Id.* ¶ 11. Anspach was provided documents, including the arrest warrants and a "target sheet" for Griffith. *Id.*; ECF 37-5, at 11:3–8. The target sheet contained information regarding Griffith's alias, "Gunslinger," and his criminal history, which included assault, attempted murder, burglary, and gun possession. ECF 37-8, at 3 ¶ 11. The prior charges included a "1976 ... assault charge, [a] '77 assault with intent to murder charge, '81

3

possession of illegal shotgun, '84 battery, '86 transportation of a handgun, '89 assault, and '91 battery. ECF 54-3 (Detective Kafchinski Interview), at 2, 5:205–07. Based on this criminal history, and on information that Mr. Griffith "is normally armed with a knife" and might have a firearm, *id.*, 5:186-191, "a determination was made that a VCT would be used to apprehend Griffith if he went mobile in a vehicle." ECF 37-8, at 3 ¶ 13; ECF 37-9, at 3 ¶ 11; *accord* ECF 37-10, at 3 ¶¶ 10–15.

### C.     The Employment of a VCT on Plaintiff's Vehicle

On February 13, 2020, Anspach arrived at Griffith's address, and "immediately saw an individual strongly resembling Griffith exit the residence with another male." ECF 37-14, at 2; ECF 37-5, at 2:2–10. Anspach reported over the radio that, upon exiting the residence, the individual resembling Griffith entered the passenger's side, and the other male entered the driver's side of a white Mercedes-Benz vehicle that then "went mobile." ECF 37-14, at 2. Anspach followed the Mercedes-Benz vehicle and "was then able to visually confirm that Griffith was the passenger of the vehicle" by pulling up next to the passenger side window. ECF 37-14, at 2; ECF 37-5, at 2:15–3:1. Anspach relayed his visual confirmation to his team, who then got into position. ECF 37-5, at 3:13–14.

The Mercedes-Benz vehicle was traveling on 355 South, while Anspach, Oves, and Hartman covertly surrounded the vehicle in their unmarked police cars. ECF 37-5, at 5:1–5; ECF 37-6, at 2:14–15. Oves drove directly behind Plaintiff's vehicle. ECF 37-5, at 5:1–2. Hartman drove directly in front of Plaintiff's vehicle. ECF 37-5, at 5:2–5; ECF 37-6, at 2:14–15. Anspach was responsible for the passenger's side where Mr. Griffith was seated, ECF 37-5, at 7:16–18, and Helton was responsible for the driver's side, where Plaintiff was seated, ECF 37-14, at 3. Defendants did not know the identity of the driver.

4

When Plaintiff's vehicle came to a red traffic light at Watkins Mill Road and 355 South, and when "all vehicles approached a natural stop[] and the SAT vehicles were in position around the Mercedes-Benz vehicle," ECF 37-14, at 2, Oves called over the radio to Hartman, Helton, and Anspach to begin the VCT. ECF 37-3, at 5:18–21.

All four police vehicles then initiated contact with Plaintiff's vehicle. ECF 37-14, at 3. Plaintiff asserts the vehicles approached at a high rate of speech, and Defendants assert it was a low rate of speed. *See* ECF 1, at 6 ¶¶ 24–26; ECF 49-6 (Helsel Deposition), at 14, 96:14–20 (alleging the officer that collided with the front of his car was "going backwards at 30 miles an hour"). Plaintiff also asserts that he was injured during the collision. *See* ECF 49-6, at 4–5 ("[M]y face got smashed up against this column. . . [Griffith's] head busted into mine . . . and luckily I didn't go through the glass[.]"); ECF 49-6, at 19, 105:4–6 (regarding Plaintiff's loss of consciousness). The officers approached Plaintiff's vehicle with guns drawn. ECF 49-5, at 20:3– 5. Griffith was then arrested, ECF 49-6, at 21, 111:12–14. Plaintiff was not placed under arrest, and Plaintiff consented to the search of his vehicle.[2]

---

[2] Plaintiff testified by deposition that he did not consent to the search of his vehicle, but that he felt "had no choice" and was compelled to authorize the search. ECF 37-7, at 28:15. Plaintiff testified to the following interaction:

> I told them no—I did tell them no twice. And then I literally said—because I don't, I don't, I don't tolerate stupidity at all from anybody. So I literally said, "No, you cannot search my vehicle. No, you cannot search my vehicle." Totally ignored, but I said, "Hey, do you guys understand English?" And then, of course, I was ignored again. And I said, "Oh, ya, que pasa." (Witness speaking Spanish.) And I started speaking Spanish to them. (Witness speaking Spanish.) And of course, no one responded to me and they proceeded to go ahead, start—tore apart my trunk. I mean, then they didn't take anything out of my car, but they went through my trunk and all this stuff was. . . So I mean, they did go through my vehicle, but no, I did not consent to them searching my vehicle.

*Id.* at 29:1–19. The video evidence, captured on a responding officer's (Officer Christine Latifov) body worn camera, shows that when initially asked for the keys, Plaintiff declined. Def. Ex. 9,

The VCT did not cause any of the vehicle's airbags to deploy. ECF 49-6, at 15, 99:10–12 (acknowledging airbags did not deploy after first contact with vehicle in front); *id.* at 21, 111:15–17 (acknowledging airbags did not deploy after second contact with vehicle in the back); ECF 37-8, at 4 ¶ 22. Plaintiff submits photographs of the vehicle damage, which shows some scratches, dents, and a broken Mercedes-Benz emblem on the front bumper. ECF 49-8, at 7. The photographs also show the contact between Defendants' vehicles and Plaintiff's vehicle, *id.* at 4, 6, 9, 16–17, as well as pictures of Defendants' vehicles with minor white paint marks or scratches from where Defendants' vehicles made contact with Plaintiff's. *Id.* at 2–3, 5, 8. Additionally, Plaintiff submits a damage estimate indicating the total price of repairs is $12,413.61. ECF 49-9, at 8.

### D.   Procedural History

Plaintiff filed the present suit on February 9, 2023. ECF 1. Plaintiff brings the following claims: Count I (Battery); Count II (False Imprisonment); Count III (Gross Negligence); Count IV (Violations of 42 U.S.C. § 1983); and Count V (Violation of Maryland Declaration of Rights).[3] ECF 1, at 12–19. The case was transferred to the undersigned on October 20, 2023. After discovery deadlines and other deadlines were extended by consent motion, *see* ECF 30, 36,

---

BWC Latifov, at 0:03–0:07. The officer said, "I'm not allowed to?" and when Plaintiff affirmed, the officer said "alright" and walked away. *Id.* at 00:08–00:12. Plaintiff then said "Here, here, here" and offered his keys to the officer. *Id.* at 00:12–00:15. The video otherwise shows Plaintiff smiling, laughing, and drinking from a to-go coffee mug while waiting in the roadway. *Id.* at 00:20–00:35. At no point in the exchange captured on video did Plaintiff speak Spanish to any of the officers, nor was his trunk opened or its contents searched before he gave them the keys to search the car. Where, as here, the record "blatantly contradicts" Plaintiff's version of events such that "no reasonably jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[3] The fifth cause of action, alleging Article 24 and 26 violations of the Maryland Declaration of Rights, was mistakenly identified as Count III in the Complaint. *See* ECF 1, at 17. For clarity, this cause of action will be referred to as "Count V."

Defendants filed the present Motion on February 6, 2024. ECF 37. Defendants' Motion is fully briefed and ripe for disposition.

## II.     **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. V. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court cannot weigh the evidence, *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (citing *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659–60 (4th Cir. 2018)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia*

7

*Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

## III.   ANALYSIS

Plaintiff asserts Defendants "needlessly directed force at Plaintiff" in violation of federal and state law in a manner that was "patently unreasonable," ECF 49, at 1, while Defendants maintain that they acted "with legal justification when they stopped Plaintiff's vehicle to arrest Plaintiff's passenger who had four outstanding arrest warrants." ECF 37, at 1. As a result of the search and seizure of Plaintiff on February 13, 2020, Plaintiff alleges Defendants violated: (1) the Fourth and Fourteenth Amendment; (2) Article 24 and Article 26 of the Maryland Declaration of Rights; as well as alleging Defendants committed (3) battery and false imprisonment, and gross negligence under Maryland common law. *See* ECF 1, at 12–19. As explained herein, the Court finds Defendants' temporary seizure of Plaintiff via execution of a VCT was objectively reasonable under the circumstances presented, namely when Plaintiff's passenger was a wanted fugitive for serious sex crimes and where Defendants instituted a method of arrest aimed to protect officer and public safety. *See infra* Section III.A.

### A.   **Plaintiff's Fourth and Fourteenth Amendment Claims are Dismissed.**

In Count IV, Plaintiff alleges Defendants violated his Fourth and Fourteenth Amendment rights when they conducted a VCT that damaged his vehicle, and when Defendants subsequently seized and searched Plaintiff's person and vehicle. ECF 1, at 16–17. As Plaintiff has abandoned

8

his Fourteenth Amendment claim and his claim that an illegal search was conducted, the Court focuses on Plaintiff's excessive force claim.[4]

Plaintiff claims that he was unlawfully seized in violation of the Fourth Amendment when Defendants initiated a VCT, thereby hitting Plaintiff's vehicle to arrest Plaintiff's passenger. *See* ECF 1, at 8–9 ¶¶ 39–42. The Fourth Amendment protects "[t]he right of the people . . . against unreasonable searches seizures. . . ." U.S. Const. amend. IV. Plaintiff asserts various arguments including that: (1) Defendants lacked legal authority to stop his vehicle; (2) Defendants' seizure of Plaintiff should be analyzed akin to a de facto arrest; and (3) Defendants' use of a VCT constituted excessive force. ECF 49, at 1–2, 15–17.

Plaintiff's first argument, that there was no legal basis to stop him, is unavailing. *See* ECF 49, at 2. As Defendants note, law enforcement officers have a legal basis to stop a vehicle transporting an individual with outstanding arrest warrants. ECF 37-2, at 10–11. Courts in this

---

[4] A party is considered to have abandoned a claim by failing to address that claim in opposition to a motion for summary judgment. *See Mentch v. Eastern Savings Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997); *Grant-Fletcher v. McMullen & Drury, P.A.*, 964 F. Supp. 2d 514, 525 (D. Md. 2013); *Sparrow v. City of Annapolis*, Civ. No. WMN-16-1394, 2017 WL 3413596, at *5 n.2 (D. Md. Aug. 9, 2017) (concluding Plaintiff abandoned claim for false imprisonment by failing to respond to Defendants' arguments in a summary judgment motion); *Morgan v. City of Charlotte*, Civ. No. 22-00003, 2023 WL 4002524, at *15 (W.D.N.C. June 14, 2023) (holding Plaintiff abandoned her state law claims in an excessive force case by failing to respond to Defendants' arguments in Defendants' motion for summary judgment).

In Defendants' Motion, they argue they are entitled to summary judgment on the Fourteenth Amendment claim because it is well-established that claims of unlawful search and seizure as well as claims of unlawful use of force in the context of a seizure are analyzed under the Fourth Amendment, not the Fourteenth Amendment. ECF 37-2, at 10 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). As Plaintiff does not respond to this argument, ECF 49, Plaintiff has abandoned his Fourteenth Amendment claim. *See* ECF 54, at 12 (arguing the same). Additionally, Plaintiff fails to respond to Defendants' arguments pertaining to the lawfulness of the search Defendants conducted of Plaintiff and Plaintiff's vehicle. *See* ECF 49; ECF 54, at 11–12. Therefore, for the same reasons indicated above Plaintiff has abandoned his Fourth Amendment claim to the extent he raised a theory of an unlawful search.

district, and others have recognized this principal. *See United States v. Palacio*, 427 F. Supp. 3d 662, 670 (D. Md. 2019) ("Knowledge that an occupant of a vehicle has an outstanding arrest warrant provides a sufficient basis to support a traffic stop to arrest that individual." (citation omitted));[5] *see United States v. Kent*, 531 F.3d 642, 650 (8th Cir. 2008) ("Due to the outstanding felony arrest warrant, the police had probable cause to believe that [the defendant] had committed a felony, and to arrest him when found."); *see also United States v. Cardenas-Celestino*, 510 F.3d 830, 833 (8th Cir. 2008) (observing that "[w]hen probable cause to arrest exists, police are authorized to stop a vehicle containing the subject.").

While Plaintiff criticizes Defendants for waiting until Griffith entered Plaintiff's vehicle, *see* ECF 49, at 2, this "argument concerning the timing and location" also fails as law enforcement officers are not required to undertake an arrest at any particular time or place. *United States v. Potter*, No. 21-00120-01-CR-W-HFS, 2022 WL 18399759, at *6 (W.D. Mo. Oct. 14, 2022), *report and recommendation adopted*, No. 21-00120-CR-W-HFS, 2023 WL 346816 (W.D. Mo. Jan. 20, 2023). "Once law enforcement possesses probable cause to arrest an individual, they are not required to do so at a particular time or a particular location." *Id.* (citing *United States v. Johnigan*, 90 F.3d 1332, 1337 (8th Cir. 1996)); *see also Hoffa v. United States*, 385 U.S. 293, 310 (1966) (recognizing the police are not required to arrest a suspect at the "precise moment" at which they have probable cause). Plaintiff cites no legal authority to support that Defendants lacked a legal basis to conduct a stop to arrest Plaintiff's passenger who Defendants understood had four active

---

[5] Plaintiff challenges reliance on *Palacio*, 427 F. Supp. 3d at 670–71, because in that case the officers observed the driver commit traffic violations. *Id.* Defendants argue that this point is "is irrelevant . . . given that . . . a warrant alone is a sufficient basis to support a traffic stop to arrest the individual . . : [and] the Officers here had more than 'reasonable suspicion' which is required for a traffic stop/Terry stop; the Defendant Officers had four judicially reviewed felony arrest warrants for Plaintiffs' passenger." ECF 54, at 2 n.3.

arrest warrants. *See* ECF 49, at 2. Rather, Plaintiff appears to conflate Defendants' legal authority to conduct a stop with his criticisms of the manner Defendants chose to conduct the stop, which the Court discusses *infra* in evaluating Plaintiff's excessive force claim. *See id.* ECF 49, at 2, 15–16.

Plaintiff's next argument, that the stop constituted a de facto arrest, is equally unavailing, when as here Plaintiff makes no allegations about the length of time of the stop. *See* ECF 49, at 2 (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985), for the proposition that the line between a temporary detention and de facto arrest is elusive and not easily defined). Plaintiff provides no evidence that he was held for an unreasonable period of time. *Sharpe*, 470 U.S. at 685 (explaining that courts in this context are tasked with assessing "whether a detention is too long in duration to be justified as an investigative stop").

As to Plaintiff's excessive force claims, the Court finds the use of force was objectively reasonable in light of the facts Defendants had at the time of initiating the VCT. When evaluating an excessive force claim, courts apply an objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Courts assess objective reasonableness by balancing "the nature and quality of the intrusion on an individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal citation and quotation marks omitted). The Supreme Court has identified three non-exhaustive factors to guide this balancing: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight, *id.* As is customary in this Circuit, courts also consider an additional factor: the injuries of the subject of the allegedly excessive use of force. *See Jones v. Buchanan*, 325 F.3d 520, 530 (4th Cir. 2003) (noting the extent of injuries "is another consideration in determining whether force

was excessive"); *see also Graham*, 490 U.S. at 396 (explaining the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case").

To start, it is notable that every other court that has analyzed the use of a VCT has determined that its use was objectively reasonable. *See, e.g., Nelson v. City of Los Angeles*, Civ. No. 11-5407, 2014 WL 6066053, at *7 (C.D. Cal. Nov. 13, 2014) (holding "a reasonable police officer on the scene would have thought Plaintiffs posed a threat to both police and the public" when plaintiffs who were "prime suspects" in a string of armed robberies had just left the scene of an attempted armed robbery and allegedly had not disposed of the firearms, and that use of a VCT was objectively reasonable); *Simpson v. Devore*, Civ. No. 16-2981, 2019 WL 1284101, at *6 (D. Nev. Mar. 20, 2019) (finding a reasonable officer could determine that the use of the "jamming method" was justifiable given plaintiff's tendency to flee and the violent nature of the crimes for which defendants were attempting to execute his arrest, and that the use of force was reasonable given the minor injuries plaintiff sustained); *Lane v. City of Mesa*, Civ. No. 19-00852, 2021 WL 11650853, at *10 (D. Ariz. Nov. 9, 2021) (holding VCT was objectively reasonable when suspect had committed violent and severe crimes including assault, theft, and attempted kidnapping, when suspect had fled in a stolen car in an erratic manner, and when the VCT did not cause any harm or injury to the occupants of the vehicle).

Plaintiff argues each of these cases are distinguishable. *See* ECF 49, at 20–21. Additionally, Plaintiff argues these cases do not "stand for the proposition that vehicular collisions have been established as *per se* constitutionally appropriate means of affecting seizures." *Id.* at 20. This is no doubt true; however, such a reflection does little to advance Plaintiff's case, as even accepting Plaintiff's argument that each of the cases cited to by Defendants involved circumstances in which officers had stronger evidence of an imminent and direct threat to officer and public

safety, the Court nevertheless finds that the facts in this case support that the exercise of the VCT was objectively reasonable.

### 1.    The First *Graham* Factor

The first *Graham* factor requires courts to consider the severity of the crime. *Graham*, 490 U.S. at 396. Here, Griffith was the subject of four outstanding warrants for felony rape and sex assault against minors. ECF 37-2, at 15. Defendants argue that these are crimes of violence under Maryland law. *Id.* at 16 (citing Md. Code Ann., Crim Law ("CL") §3-304 (rape in the second degree), and CL § 14-101(8), (12)–(13), (15)–(16) (defining rape, sexual assault in the first and second degree, child abuse, and sexual abuse of a minor as "crimes of violence"). Given the crimes Griffith had alleged committed were crimes of violence, Defendants argue that "crimes of this nature pose an immediate and significant danger to the community, making the apprehension of Griffith an immediate priority." *Id.* Admittedly, the crimes alleged here—those of a sexual nature—pose less of an immediate risk to officer safety in initiating the arrest when compared to the bank robbery suspects in *Nelson*, 2014 WL 6066053, at *7. Nevertheless, a reasonable officer may construe urgency from the severity of these crime, as the failure to apprehend Griffith may pose a continuing threat to the community. *See Andersen v. DelCore*, 79 F.4th 1153, 1164 (10th Cir. 2023) (finding first *Graham* factor weighed in favor of reasonableness of the search given crimes suspected were of a sexual nature).

The Court's conclusion that this factor weighs against Plaintiff is supported by *Andersen v. DelCore*, 79 F.4th 1153, 1164 (10th Cir. 2023). In *Anderson*, the Tenth Circuit held that the first *Graham* factor weighed in favor of a law enforcement officer's use of force being reasonable when the arresting officer grabbed a suspect's wrist to secure his telephone on suspicion that the phone contained evidence of the "serious crime of child abuse" that could be a felony under applicable state law. *Id.* The Tenth Circuit noted that "the first *Graham* factor weighs against the  .

plaintiff when the crime at issue is a felony." *Id.* (quoting *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021)); *cf. Nazario v. Gutierrez*, 103 F.4th 213, 234 (4th Cir. 2024) (holding officer who had "probable cause for a non-criminal, traffic infraction and a misdemeanor obstruction of justice" was not severe when "[t]he traffic infraction created no public danger, and its severity was extremely minimal"). Much like in *Anderson*, there were four pending arrest warrants against Griffith for sexual assault and sexual abuse of a minor, which under Maryland law are considered felonies. ECF 37-8, at 3 ¶ 11; CL § 3-304. Additionally, Maryland treats this class of felonies so seriously that they are defined as crimes of violence for sentencing purposes. *See* CL § 14-101. Thus, much like in *Anderson*, the Court finds the first *Graham* factor weighs against Plaintiff. *See* 79 F.4th at 1164.

### 2.    The Second *Graham* Factor

The second *Graham* factor "addresses whether the suspect posed an immediate threat to the safety of the police officers or others." *Nazario*, 103 F.4th at 234. This factor also weighs against Plaintiff. Defendants were aware that the passenger of Plaintiff's vehicle had four pending arrest warrants for various sex crimes, ECF 37-8, at 3 ¶ 11, and they were aware that Griffith went by the alias "Gunslinger," *id.*, a fact that would permit a reasonable officer to suspect that Griffith was likely to regularly carry a gun on his person. Additionally, Defendants were aware that Griffith had a violent criminal history including assault and assault with intent to commit murder, as well as weapon possession offenses. ECF 54-3, at 2, 5:205–07. While Griffith's criminal history was remote in time, ECF 54-3, at 2, 5:205–07, Defendants also had a more contemporaneous reason for concern, ECF 54-3, at 2, 5:186–91. Specifically, Detective Kafchinski warned Defendants that one of the victims of the recent felonies cautioned that he "could have a gun" and that Griffith "is normally armed with a knife." *Id.* Given the information

Defendants had before them, it was reasonable for them to believe that Griffith may be armed and that he may be violent.

Plaintiff makes much of the fact that the decision to use a VCT was "premeditated." *See* ECF 49, at 1, 3–4. However, the Court is unpersuaded that the mere premeditated determination to employ a VCT *if* Griffith entered a vehicle constituted an objectively unreasonable violation of Plaintiff's Fourth Amendment rights, given that Defendants did not have an opportunity to arrest Griffith before he entered Plaintiff's vehicle, ECF 54-4, at 3, 35:2–4; ECF 37-14, at 2; ECF 37-5, at 2:2–10, as Griffith immediately went mobile when Anspach arrived to conduct surveillance, ECF 54-4, at 3, 35:2–4.

### 3.    The Third *Graham* Factor

As to the third factor, although Griffith was not attempting to flee or evade the police at the time the VCT was implemented, Defendants argue the VCT is utilized to prevent flight. ECF 37-2, at 17. VCTs in general, are not utilized to cause injury, but, instead, to create a safer mechanism to arrest a potentially violent felony suspect, such as Griffith. *See, e.g.*, ECF 37-10, at 2 ¶ 5. While this factor is largely inapplicable to this scenario, the Court will treat it as slightly favoring Plaintiff.

### 4.    The Fourth Factor

Plaintiff and Defendants paint dramatically different pictures of the execution of the VCT. Plaintiff's allegations that the officer in front of his vehicle was "going backwards at 30 miles an hour," ECF 49-6, at 14, 96:14–20, and his claim that his "face got smashed up against this column. . . [Griffith's] head busted into [his]" causing him to lose consciousness, ECF 49-6, at 4, 49:20–22; *id.* at 19, 105:4–6, stands in stark contrast to Defendants' claims that they accelerated at a low and controlled rate of speed." ECF 37-8 ¶ 6; ECF 37-9 ¶ 6; ECF 37-10 ¶ 6. This difference, under other circumstances, might be sufficient to generate a genuine dispute of material

fact. *See Black & Decker Corp.*, 436 F.3d at 442. However, where, as here, the record "blatantly contradicts" Plaintiff's version of events such that "no reasonably jury could believe it," the court will not adopt plaintiff's version of these facts for purposes of ruling on a summary judgment motion. *Scott*, 550 U.S. at 380; *accord Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (noting that when a video "quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment" (citation omitted)); *Hall v. Washington Metro. Area Transit Auth.*, 33 F. Supp. 3d 630, 633–34 (D. Md. 2014) (finding video evidence in the record clearly negated Plaintiff's factual assertions); *Henderson v. Simpkins*, Civ. No. CCB-13-1421, 2014 WL 3698878, at *8 (D. Md. July 24, 2014) (granting summary judgment where evidence clearly negated plaintiff's allegations of excessive force); *Glascoe v. Sowers*, Civ. No. 11-2228-ELH, 2013 WL 5330503, at *5 (D. Md. Sept. 20, 2013) (explaining that where a video "clearly depict[s] the events at issue, they will prevail over contrary evidence submitted by either side."); *Riddick v. Washington Metro. Area Transit Auth.*, Civ. No. GJH-21-1300, 2021 WL 5999271, at *3 (D. Md. Dec. 20, 2021) ("Simply put, the video plainly contradicts Plaintiff's allegations, and they must be disregarded."); *cf. Alexander v. Connor*, No. 23-6151, 2024 WL 3092289, at *3–4 (4th Cir. June 24, 2024) (cautioning that this principal is not merely applied when it is "unlikely that the plaintiff's account is true" and emphasizing the plaintiff's version must be "blatantly and demonstrably false" (first quoting *Witt*, 633 F.3d at 276, then quoting *Harris v. Pittman*, 927 F.3d 266, 276 (4th Cir. 2019))).

First, no reasonable jury could credit Plaintiff's allegations that Defendants accelerated at 30 miles per hour to hit the front of Plaintiff's vehicle, as the photographic evidence of the front of Plaintiff's vehicle shows minor damages (*i.e.*, scratches, a broken Mercedes-Benz emblem, and

minor dents on the front bumper), and the undisputed evidence of all the officers and Plaintiff is that none of the vehicles' airbags deployed. *See* ECF 49-9; 37-10, at 3 ¶14; ECF 37-9, at 3 ¶ 15; ECF 37-8, at 4 ¶ 22; ECF 37-15, 99:10–12. More important to this inquiry though is that no reasonable jury could credit Plaintiff's allegation that he was hit numerous times in the head and fell unconscious due to the force of the various impacts when video evidence at the scene shows Plaintiff chatting with officers, laughing, smiling, and casually drinking from a to-go-coffee-mug immediately after the VCT. Def. Ex. 9, BWC Latifov, at 00:20–00:35; *Scott*, 550 U.S. at 380. Given that Plaintiff provides no evidence of medical injuries and Plaintiff's version of events is "so utterly discredited by the record that no reasonable jury could have believed him" the Court "view[s] the facts in the light depicted by the videotape." *Id.* at 381. Accordingly, Plaintiff's bare allegation of a serious physical injury does not create a triable issue of fact. Given the lack of any record evidence of Plaintiff's physical injuries, the fourth factor weighs against Plaintiff.

Ultimately, when viewing Plaintiff's allegations in total there is nothing that separates Defendants' conduct in this case from the execution of an ordinary VCT. A reasonable officer who received specialized training in this method could reasonably believe that the method, when properly implemented, constitutes a minimal intrusion on a driver's vehicle. *See, e.g.*, *Nelson*, 2014 WL 6066053, at *7 ("The police intrusion in stopping Plaintiffs' truck was minimal . . . the impact of the police car was sufficient only to "jar" them"). The Court is not unsympathetic to Plaintiff's claims that damages were sustained to his vehicle, damages apparently amounting to over $12,000 and that could have been avoided had the arrest of Griffith been carried out in a different manner. However, the Court is tasked with evaluating the officer Defendants' information at the moment they decided to institute the VCT. *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (noting the "inquiry into the reasonableness of the force [] requires [a Court] to

'consider the facts at the moment that the challenged force was employed' 'with an eye toward the proportionality of the force in light of all the circumstances.'" (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015))).

It is not beyond notice that Anspach confirmed the identity of Griffith by pulling up to the passenger side of the vehicle and comparing Griffith to the photo on the target sheet, prior to initiating the arrest, a fact that further supports that Defendants were not unreasonably infringing on the rights of drivers on a bare unsubstantiated suspicion. *See* ECF 37-5, at 3:13–14. Additionally, in executing the VCT, Defendants waited for Plaintiff's vehicle to come to a natural stop, a measure intended to reduce damage to property and injury to occupants within the vehicle. ECF 37-14, at 2; *see also* ECF 37-8, at 2 ¶ 5.

Finally, the mere fact that there may have been less intrusive means of instituting this arrest does not render Defendants' use of force in this case unreasonable. *See Sharpe*, 470 U.S. at 686–87 ("A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable.'" (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973))).

To be clear, the Court does not sanction the use of the VCT in every circumstance and is not called upon to make such a sweeping ruling today. It should go without saying that the technique should not be utilized in every arrest, and must be reserved for relatively rare situations where, like here, the offenses at issue are sufficiently serious and the person to be arrested poses a legitimate and serious risk of danger to arresting officers or the community at large. However,

viewing the largely undisputed facts surrounding this stop in total,[6] the intrusion into Plaintiff's Fourth Amendment interests do not outweigh the countervailing governmental interests at stake, namely, apprehending and arresting an individual with four outstanding arrest warrants for serious offenses. The decision to use a VCT to prevent the risk of flight and to protect officers as they arrested a man who went by the alias "Gunslinger," had a history of violent arrests, was charged with serious sex offenses, and may have been carrying a weapon, was objectively reasonable.

In the alternative, the Court is compelled to find that Defendants are shielded by qualified immunity. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citation omitted); *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982) (qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

To apply qualified immunity, the court must find that the conduct alleged would constitute a violation of a constitutional right, and that "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates the law." *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier*, 533 U.S. at 200, 202. The Court may consider either prong of the test first. *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Pearson*, 555 U.S. at

---

[6] Plaintiff has failed to generate a material factual dispute sufficient to require submission to a jury. Plaintiff argues "there is a factual dispute concerning the objective reasonableness of Defendants' conduct." ECF 49, at 17. However, Plaintiff then proceeds to list facts that are agreed upon. *See* ECF 49, at 17 (arguing that there was no probable cause to arrest Plaintiff and that Plaintiff was not trying to evade police). The only dispute Plaintiff identifies is whether Defendants "announced themselves as police officers," *see* ECF 49, at 17, a fact that Plaintiff has not established is material to the above analysis.

236. As to the second prong, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

Defendants argue that at the time Defendants initiated the VCT "there was no United States Supreme Court, Fourth Circuit or Maryland Supreme Court decision that established [a VCT stop was unconstitutional] at any time prior to the incident and cases outside of this jurisdiction state the opposite." ECF 37-2, at 18 (citing *Nelson*, 2014 WL 6066053, at *7). In fact, the only cases assessing the use of VCTs either found qualified immunity applied or that the VCT was objectively reasonable. *See, e.g.*, *Nelson*, 2014 WL 6066053, at *7 (holding use of a VCT was objectively reasonable); *Simpson*, 2019 WL 1284101, at *6 (finding qualified immunity applied as it is not "clearly established" that use of VCT violates the Fourth Amendment); *Lane*, 2021 WL 11650853, at *10 (holding VCT was objectively reasonable and in alternative officers were shielded by qualified immunity). In the absence of caselaw to the contrary, the Court agrees with the *Lane*, *Nelson*, and *Simpson* courts and finds that no reasonable officer would believe instituting a VCT, as it was implemented here, would violate a clearly established constitutional right. Plaintiff's Count IV is dismissed.

## B. Plaintiff's Article 24 and Article 26 Claims will be Dismissed.

In Count V Plaintiff claims that Defendants violated Plaintiff's rights under Article 24 and Article 26 of the Maryland Declaration of Rights. ECF 1 ¶ 79. Specifically, Plaintiff argues his right not to be subjected to excessive force during the course of an ongoing stop and/or detainment was violated. *Id.* Article 24 contains the State of Maryland's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 838 A.2d 1225, 1237 n.11 (Md. 2003). Article 24 is "the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett*, 955 F. Supp. 2d 474 (D. Md. 2013) (quotation marks omitted). Article 26, by contrast, is the Maryland analog to the Fourth Amendment. *Padilla v. State*, 949

A.2d 68, 77 (Md. App. 2008); *Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) ("Article 26 protects the same rights as those protected under the Fourth Amendment to the United States Constitution . . . .").

Both Article 24 and Article 26 are interpreted *in pari materia* with the federal analogs. *Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012); *Middleton v. Koushall*, Civ. No. ELH-20-3536, 2024 WL 1967816, at *37–38 (D. Md. May 3, 2024); *Dent*, 745 F. Supp. 2d at 661; *Tyler v. City of College Park*, 3 A.3d 421, 435 (Md. 2010). As such, the analysis under Article 24 is "for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment" and the analysis under Article 26 is duplicative of the analysis under the Fourth Amendment. *Hawkins*, 955 F. Supp. 2d at 496; *Padilla*, 949 A.2d at 77; *Dent*, 745 F. Supp. 2d at 661.

Thus, the Court's analysis of Plaintiff's federal constitutional claims controls the disposition of Plaintiff's claims under the Maryland Declaration of Rights. *See, e.g., Middleton v. Koushall*, Civ. No. ELH-20-3536, 2024 WL 1967816, at *38 (D. Md. May 3, 2024). Accordingly, for the reasons articulated above, *see supra* Section III.A., Plaintiff's Article 24 and Article 26 claims are dismissed.

### C.    Plaintiff's Battery, False Imprisonment, and Gross Negligence Claims will be Dismissed.

In Count I, Plaintiff claims that Defendants committed a battery when they "directed unreasonable, unlawful, and excessive force against Plaintiff."[7]  ECF 1, at 12 ¶ 55.  In Count II, Plaintiff alleges Defendant's excessive use of force constituted the common law tort of false

---

[7] In Maryland, "[a] battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 735 A.2d 1096, 1099 (Md. 1999) (citing Restatement (Second) of Torts § 13 & cmt. d (1965)); *see also Saba v. Darling*, 575 A.2d 1240, 1242 (Md. 1990) ("A battery has been defined as a harmful or offensive contact with a person resulting from an act intended to cause the person such contact.").

imprisonment.[8] ECF 1, at 13–14 ¶¶ 59–63. In Count III, Plaintiff alleges Defendants engaged in gross negligence.[9] ECF 1, at 14–15 ¶¶ 66–70.

In the context of an excessive force case against a police officer, Plaintiff's common law state law claims "rise[] and fall" with Plaintiff's Fourth Amendment claims. *Titus v. Town of Nantucket*, 840 F. Supp. 2d 404, 417 (D. Mass. 2011); *see also Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (holding in the context of gross negligence claims alleging excessive force that the principle of objective reasonableness articulated in *Graham v. Connor* controls); *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, 815 (E.D.N.C. 2015) (noting "assault and battery by a law enforcement office may provide the basis for a civil action for damages so long as the plaintiff can show that the force used was excessive under the circumstances"); *Main v. Wingler*, Civ. No. 22-157, 2024 WL 871384, at *9 (W.D.N.C. Feb. 29, 2024) ("The Fourth Circuit has recognized that [] 'the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence.'" (quoting *Njang v. Montgomery Cnty.*, 279 F. App'x 209, 216 (4th Cir. 2008) and citing *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998))); *Bell v. Dawson*, 144 F. Supp. 2d 454, 464 (W.D.N.C. 2001); *Wilcoxson v. Painter*, Civ. No. 13-732, 2016 WL 866327, *10 (E.D.N.C. March 3, 2016) ("Where a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity

---

[8] The tort of false imprisonment occurs when the defendant causes (1) the deprivation of the liberty of another, (2) without consent, and (3) without legal justification. *Montgomery Ward v. Wilson*, 664 A.2d 916, 925 (Md. 1995) (collecting cases) (holding "where the basis of a false imprisonment action is an arrest by a police officer, the liability of the police officer for false imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest").

[9] Under Maryland law "[a]n individual acts with gross negligence when that person 'inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (quoting *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007)).

to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims."); *Holman v. Wiggs*, Civ. No. 23-618, 2024 WL 2784919, at *7 (M.D.N.C. May 30, 2024) ("Thus, '[w]here a plaintiff brings both a § 1983 excessive force claim and a common law claim for assault and battery, the court's determination of the reasonableness of the force used with respect to the § 1983 claim controls its assault and battery analysis,' at least insofar as constitutionally excessive force will be deemed to constitute a battery." (citation omitted)).   Accordingly, as the Court finds Defendants conduct was objectively reasonable, *see supra* Section III.A., Plaintiff's common law claims are dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. A separate implementing Order will issue.

Dated: July 1, 2024

_____/s/_____

Brendan A. Hurson
United States District Judge